IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HELENE PURCELL,               )
                              )
          Plaintiff,          )
                              )     No. 13 C 2057
v.                            )
                              )     Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN,            )
Commissioner of Social Security, )
                              )
          Defendant.          )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Helene Purcell has filed a motion (doc. # 13) to reverse or remand the final determination by the Commissioner of Social Security ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB"). The Commissioner has responded, seeking affirmance of the decision denying benefits (doc. # 37). For the following reasons, the Court grants the Commissioner's motion and denies Ms. Purcell's motion.

## I.

On March 15, 2010, Ms. Purcell applied for DIB, alleging a disability onset date of March 15, 2009 (R. 183-89, 226). Her last-insured date was March 31, 2014 (R. 226). Ms. Purcell's claims were denied initially and upon reconsideration, and a hearing was held before an ALJ on March 13, 2012 (R. 77, 146-49, 153-55). In a written opinion issued on March 30, 2012, the ALJ concluded that Ms. Purcell was not disabled from her alleged onset date through the date of the opinion (R. 18-30). The Appeals Council denied Ms. Purcell's request for review of the

---

[1] On February 28, 2013 by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. #6).

ALJ's decision (R. 1-6), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. We review Ms. Purcell's general background and medical record in Part A; the hearing testimony in Part B; and the ALJ's written opinion in Part C.

## A.

Ms. Purcell was born December 14, 1961, making her 47 years old on March 15, 2009 – her alleged disability onset date (R. 183). From at least April 2001 until her alleged disability onset date, Ms. Purcell was treated sporadically for depression and bi-polar disorder (R. 339-509).[2] The record reflects a three-day hospital admission at Glenbrook Hospital from April 6 to April 9, 2001 (R. 339-440), and outpatient appointments at the Great Lakes Naval Hospital's psychiatric clinic in November 2006 and April 2007 for medication refills and blood work (R. 502-03, 494-95).

In January 2008, Ms. Purcell's son committed suicide while enlisted in the Navy (R. 114, 116). Ms. Purcell next sought psychiatric treatment in March 2008, when she met with psychiatrist Jeffrey Jones regarding stress over her son's suicide and her mother, who was ill and who later passed away in January 2009 (R. 445, 474-75). Ms. Purcell saw psychiatrists Dr. Jones (three times) and Dr. Charles Ludmer (once) and therapist Barbara Cooper, Ph.D (two times) between April and August 2008 (R. 458-90). While Ms. Purcell demonstrated a dysphoric, or depressed, mood, sadness over the loss of her son, and sad affect at these

---

[2] "Bipolar disorder — sometimes called manic-depressive disorder — is associated with mood swings that range from the lows of depression to the highs of mania." http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/definition/con-20027544 (last visited July 30, 2014). 2001 is the first year for which we have medical documentation of Ms. Purcell's treatment for bi-polar disorder, but anecdotal evidence in the record reveals that she has been treated for mental health issues going back to the mid-1980's (R. 578).

appointments, her thought processes were not impaired and she did not demonstrate any psychoses (R. 459, 462, 465, 470, 473).

The record does not reflect Ms. Purcell seeking any additional mental health treatment until her alleged onset date. On March 15, 2009, Ms. Purcell was admitted to the emergency room at the North Chicago VA hospital for anxiety and symptoms related to withdrawal from Ativan (R. 852-65, 1139-52). Progress notes from the visit state that Ms. Purcell was observed to have no suicidal or homicidal ideations, and was not a danger to herself or others (R. 855). She was discharged as medically stable that same day, and followed up with psychiatrist Robert C. Powell (R. 454-57).

Ms. Purcell began seeing psychologist Faan Yeen Sidor, Ph.D., on April 10, 2009 and psychiatrist Tracy L. Price on April 24, 2009 (R. 441-53, 547-55). Ms. Purcell would be seen fifteen times by Dr. Sidor and thirteen times by Dr. Price over the next eight months (*Id.*). Throughout this period, Ms. Purcell complained of unresolved depression as a result of her mother and her son passing away as well as auditory hallucinations, paranoia surrounding going out and what she wore, and fear of her husband leaving her (R. 510-33, 537-48). She showed improvement over the summer, but her symptoms worsened starting in September 2009 (R. 906-7, 953-63).

In December 2009 Ms. Purcell required hospitalization, and was admitted to the North Chicago VA Hospital from December 14 to December 24 (R. 573-87). On admission, she complained of depression and anxiety (R. 574). The hospital noted she had been drinking on and off over the past nine months and had developed irritability, insomnia, psychotic symptoms (including auditory hallucinations instructing her to kill herself and somatic delusions of ghosts touching her and passing through her), and suicidal thoughts (R. 574, 576). Given her increase

in symptoms, even while taking several medications,[3] Ms. Purcell's doctors suggested she undergo electroconvulsive therapy ("ECT"),[4] which she began while still hospitalized, on December 14, 2009 (R. 574-76, 583-85). Ms. Purcell underwent ECT four times between December 14 and December 24 (*Id.*). Upon discharge, Ms. Purcell was noted to be doing well and was "excited about going home, feeling safe, with minimal [auditory hallucinations], no other psychotic [symptoms], decreased irritability and improved sleep, decreased depression, more hopeful and with no [suicidal or homicidal intent]" (*Id.*). On December 31, Dr. Sidor noted that Ms. Purcell "continues to recover from severe depression" and was "feeling less depressed and [was] not experiencing any auditory hallucinations, [suicidal intent] or paranoid feelings as she was [] prior to her hospitalization" (R. 873-74).

Ms. Purcell underwent ECT seven times in January 2010 and eight more times between February 2010 and July 2010 (R. 588-688). Dr. Sidor noted after a February 1 appointment that Ms. Purcell was not feeling paranoid or experiencing auditory hallucinations and had no suicidal intent; she also reported that she was exercising more often (R. 868). Progress notes from a February 26, 2010 visit to her primary care physician show Ms. Purcell complained of impaired memory as a result of "ECT and medication" (R. 634). During a March 12, 2010 appointment with her primary care physician, she reported feeling better since beginning ECT and said that she had plans to travel in the summer (R. 630). In a March 19, 2010 mental health evaluation completed by a VA doctor, Ms. Purcell reported improvement in her symptoms with ECT but said she was still haunted by her son's death (R. 619). She denied any suicidal or homicidal

---

[3] At the time of her hospital admission, Ms. Purcell was taking Lexapro, Ativan, Tegretol and Wellbutrin. In previous months Dr. Price had also tried her on Risperdal, Seroquel, Neurontin and Abilify but stopped each because of various side effects (R. 574-75).

[4] "Electroconvulsive therapy (ECT) is a procedure in which electric currents are passed through the brain, intentionally triggering a brief seizure. ECT seems to cause changes in brain chemistry that can quickly reverse symptoms of certain mental illnesses." http://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/basics/definition/prc-20014161 (Last visited July 30, 2014).

intent, paranoid thinking, or perceptual disturbances during the evaluation and reported feeling "okay right now" (*Id.*).

On May 4, 2010, Ms. Purcell was evaluated by state agency consulting psychologist Patricia M. Morrin, Psy.D. (R. 984-990). Ms. Purcell reported being able to attend to her personal care, and was able to clean and do laundry (R. 985). Additionally, Ms. Purcell reported she had close friends and "lots of social contacts on Facebook . . . [and] sees and talks to her friends regularly" (R. 986). She also had good relationships with her husband and daughters (R. 988). Dr. Morrin assessed Ms. Purcell with a slightly flat mood and affect (*Id.*). She also noted that Ms. Purcell's thought processes, immediate and past memory, and ability to recall information and perform calculations were all intact (R. 987). Additionally, she was able to think abstractly, note similarities and differences between objects, and use sound judgment (*Id.*).

On June 3, 2010, state agency medical consultant A. Johnson, Ph.D prepared a mental residual functional capacity questionnaire after reviewing Ms. Purcell's medical record (R. 1347-50). Dr. Johnson opined Ms. Purcell was moderately limited in her ability to: maintain attention and concentration for extended periods of time, complete a normal workday/workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and accept instructions and respond appropriately to criticism from supervisors (R. 1347-48). Dr. Johnson designated Ms. Purcell as "not significantly limited" in the questionnaire's remaining categories of analysis (*Id.*).[5]

---

[5] These categories include, among others: (1) ability to carry out very short and simple instructions, (2) ability to carry out detailed instructions, (3) ability to perform activities within a schedule, maintain regular attendance and be punctual, (4) the ability to maintain an ordinary routine, (5) the ability to work in coordination with or proximity to others without being distracted, (6) the ability to make simple work-related decisions, (7) the ability to interact appropriately with the general public, (8) the ability to ask simple questions, accept instructions and respond appropriately to criticism, (9) the ability to get along with coworkers and maintain socially appropriate behavior, (10) the ability to respond appropriately to changes in the work setting and (11) the ability to set realistic goals or make plans independently of others (R. 1348).

In August 2010, Ms. Purcell and her family moved from Illinois to Northern Wisconsin because the cost of living was lower there (R. 1373). On August 31, 2010 she met with local psychiatrist Ashraf N. Ahmed, M.D (R. 1345-46, 1353-54). Dr. Ahmed noted Ms. Purcell had a dysphoric mood with flat affect, but no suicidal or homicidal intent and seemed calm and pleasant (R. 1346). He noted that she was fully alert and oriented, had no abnormal movements, and "was able to count from 20 backwards and remember three objects in five minutes" (*Id.*). Ms. Purcell saw Dr. Ahmed again briefly on November 1, 2010 for medication management; during the appointment she was "calm, pleasant, interactive," and although she demonstrated "some hostility," she was able to stop herself from expressing annoyance at the doctor in a sarcastic manner (R. 1338).

Ms. Purcell also saw therapist Maureen Sinkler, LCSW, on October 8, October 18, and November 1, 2010 (R. 1369-75). At the October 8 appointment, Ms. Sinkler noted that Ms. Purcell appeared depressed with a flat affect, but her thought content was logical and organized and her judgment was good (R. 1374). She also reported drinking up to a bottle of wine four times per week (R. 1373-74). By the October 18th appointment, Ms. Purcell had reduced her drinking, and seemed to be somewhat at peace with her son's death even though she was still depressed (R. 1370-71). At her November 1, 2010 appointment, Ms. Purcell reported she was "doing fairly well" and had completely stopped drinking alcohol; Ms. Sinkler opined that the claimant's mood was generally euthymic (non-depressed) and less angry (R. 1369).

On February 3, 2011, Dr. Ahmed completed an RFC questionnaire about Ms. Purcell (R. 1333-36). Dr. Ahmed noted Ms. Purcell became easily frustrated and irritated in encounters with other people and overwhelmed with stress, which could trigger her symptoms (R. 1333). He opined that her symptoms had not impacted her ability to concentrate, but did lend to mood

6

instability, irritability, poor impulse control, anger, and frustration with supervisors (R. 1333-34). He anticipated Ms. Purcell would be off-task more than 15 percent of a work day and was unable to function in a competitive work setting, but that she had no other medical or psychological conditions which impacted her ability to function (R. 1334). In evaluating Ms. Purcell's bi-polar disorder, Dr. Ahmed checked boxes on the RFC form indicating the symptoms he had noticed in Ms. Purcell during his treatment of her: one depressive symptom (anhedonia, or the reduced ability to experience pleasure in normal activities) and no manic symptoms (R. 1335).

On September 14, 2011, Ms. Purcell saw Dr. Ahmed for the first time since November 1, 2010, again for a very brief medication management appointment (R. 1351). Dr. Ahmed noted that the claimant reported that she was eating and sleeping well and that her medications seemed to be helping. He did not see any anger, violence or aggression (*Id.*). After meeting with Dr. Ahmed, Ms. Purcell saw therapist Maureen Sinkler, also for the first time since November 1, 2010 (R. 1367-68). Ms. Sinkler also noted that Ms. Purcell's mood was euthymic, she had a sense of humor and she had accepted her son's death even though it still absorbed her every day (*Id.*). Ms. Sinkler's treatment plan did not set a follow-up date for Ms. Purcell to return to therapy; instead she was to follow-up "as needed" (*Id.*). There is no indication in the record that Ms. Purcell pursued additional therapy or medical appointments with either Dr. Ahmed or Ms. Sinkler.

Four months later, on January 26, 2012, Dr. Ahmed completed another RFC questionnaire for Ms. Purcell (R. 1355-58). The record does not indicate that Dr. Ahmed saw Ms. Purcell between the September 14, 2011 visit and January 26, 2012. In this RFC, Dr. Ahmed noted that Ms. Purcell was argumentative, challenging, and hostile to supervisors, and had frequent mood swings (R. 1356). She would need to be off-task more than 15 percent of the time

because she was "tired" and "forgetful" (*Id.*). In evaluating Ms. Purcell's bi-polar disorder, Dr. Ahmed checked boxes on the RFC form indicating the symptoms he had noticed in Ms. Purcell during his treatment of her: two depressive symptoms (anhedonia and psychomotor agitation, or purposeless and unintentional movements) and six manic symptoms (inflated self-esteem, involvement in activities with high probability of painful consequences that are not recognized, pressure of speech, decreased need for sleep, flight of ideas, and easy distractibility) (R. 1357). Dr. Ahmed again checked a box indicating that Ms. Purcell would be unable to function in a competitive work setting for an eight-hour day (*Id.*). The record reflects no progress notes from Dr. Ahmed or Ms. Sinkler discussing or otherwise recognizing these symptoms.

## B.

At the hearing before the ALJ on March 13, 2012, Ms. Purcell, who was represented by counsel, and a vocational expert ("VE") testified (R. 77).

Ms. Purcell was fifty years old at the time of the hearing, and lived with her husband and twenty year old daughter (R. 82). Ms. Purcell testified that she did not have any difficulty getting in, out, or around her home (R. 84). Ms. Purcell has a driver's license and was able to drive forty minutes to the hearing location (R. 83).

During the hearing, Ms. Purcell testified that she is a high school graduate (R. 84, 85) and served in the United States Navy as a "radioman" from 1980 through 1986, receiving an honorable discharge (R. 85). She has been supported financially by her husband's income since her alleged onset date (R. 86). Although Ms. Purcell has not worked for wages since her alleged onset date, she volunteered several times at a thrift store in October 2011 and helped clean a lake over the summer that same year (R. 87). She did not complain of any mental or physical difficulty in performing her volunteer duties (R. 88, 89).

Ms. Purcell's past work included working as a filing clerk for six months in 2008 and 2009, receptionist in 2006, customer service representative in 2006 and 2007, and sales associate from 2002 through 2004 (R. 89-91). Ms. Purcell testified that she would not be able to return to any of her past jobs if she was asked, as she has a "hard time staying . . . on task," "memory problems," and finds it hard "to get along with people" (R. 99).

Ms. Purcell described her ECT treatment history as well as her counseling and treatment with Dr. Ahmed and Ms. Sinkler; she said that she saw Dr. Ahmed "only for medication issues" (R. 100-103). She stated that her mental health worsened after her son committed suicide in 2009, and does not believe that she has recovered or developed balance in her life (R. 115-16). Ms. Purcell testified that she "get[s] confused a lot, and [] ha[s] a lot of short-term and long-term memory loss" as a result of ECT treatment (R. 117). She did state that the ECT treatments helped with her psychosis and hallucinations (*Id.*). She has not had a manic episode since beginning the ECT treatments (R. 118, 119).

With respect to her daily activities, Ms. Purcell testified that she is able to take care of her personal grooming needs and also exercises, shops, and sometimes prepares meals for her family (R. 104, 105). She washes the dishes, loads the dishwasher, does laundry, makes her own bed, and performs other household chores (R. 105). Ms. Purcell testified that she takes more time to perform certain tasks than her husband does because of her focus and memory problems (*Id.*). Ms. Purcell reads, paints, and makes wooden crafts and magnets in her spare time, and does sudoku puzzles to help her "memory or help [her] brain thinking" (*Id.*). She is able to use a personal computer, prepare and send e-mail, and use Facebook; in all, she spends one to two hours per day on her computer (R. 105-107). She likes to be the person to pay the household bills, but often has to be reminded by her husband to pay bills on time (R. 110-11).

A VE testified next. He provided Dictionary of Occupational Titles (DOT) numbers for positions equivalent to Ms. Purcell's past work, including employment clerk (205.362-014), order clerk (249.362-026), receptionist (237.367-038) and material handler (929.687-030) (R. 93-4). The ALJ then posed two hypotheticals to the VE. The first hypothetical asked what past work would be available to a fifty year old individual with a high school education who would be limited to light work and could lift, carry, push, and pull ten pounds frequently and twenty pounds occasionally (R. 121). Additionally, the individual could stand/walk for six hours and sit for six hours in an eight-hour workday with normal breaks and occasionally climb ramps and stairs, but could never climb ladders, ropes, and scaffolds (*Id.*). The person could also occasionally balance, stoop, crouch, kneel, and crawl, and must avoid exposure to hazardous conditions (*Id.*). The individual would be also limited to tasks that can be learned in thirty days or less, involve simple work-related decisions and few workplace changes, and have only occasional interaction with the public, coworkers, and supervisors (R. 121, 122). The individual also could not perform work that requires the completion of tasks within a certain time period or at a certain pace (R. 122). The VE testified that all past jobs would be classified as semiskilled and would exceed the level of intellectual functioning of an individual as described in the ALJ's hypothetical (*Id.*). The VE stated that other positions would be available to such an individual, including information clerk (DOT # 237.367-018, light, SVP: 2), Post Office folding machine operator (DOT # 208.685-014, light, SVP: 1 or 2), hand bander (DOT # 929.687-058, light, SVP: 1 or 2) (R. 122-123).

The ALJ's second hypothetical assumed the same limitations as the first, but added a limitation that the individual "would work at a slow pace for one-third of the day" (R. 123). The VE testified that such an added limitation would eliminate all employment (*Id.*). Ms. Purcell's

attorney asked the VE if employment would also be eliminated if the individual would miss more than three days of work per month (R. 124). The VE testified that there would be no jobs available to such an individual (*Id.*).

## C.

On March 30, 2012, the ALJ issued a written decision finding Ms. Purcell not disabled and denying her benefits (R. 18-30). In evaluating Ms. Purcell's claim, the ALJ applied the five-step sequential evaluation process for determining disability. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a). The process requires the ALJ to consider: (1) whether the claimant has engaged in any "substantial gainful activity" since the alleged disability onset date; (2) if her impairment or combination of impairments is severe; (3) whether her impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) whether her residual functional capacity ("RFC") prevents her from performing past relevant work; and (5) if her RFC prevents him from performing any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4), (b)-(f); 416.920(a). The claimant bears the burden of proof at Steps 1 through 4, after which the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

At Step 1, the ALJ determined that Ms. Purcell had not engaged in substantial gainful activity since her alleged onset date of March 15, 2009 (R. 20). At Step 2, the ALJ found that Ms. Purcell's severe impairments were "a mental impairment variously diagnosed to include bipolar disorder, with depressive and psychotic features, status post electro-convulsive therapy, alcohol and marijuana abuse (in remission)", and lumbar arthralgia (R. 20).[6] At Step 3, the ALJ determined that Ms. Purcell's impairments did not meet or medically equal a listed impairment

---

[6] As Ms. Purcell's physical limitations due to her back problems are not in dispute or otherwise relevant to our analysis, we do not further address this impairment.

(R. 21). In making this determination, the ALJ found that Ms. Purcell did not meet the so-called "Paragraph B" criteria in the Social Security Administration's listings of mental impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically the listings in §§ 12.04 (affective disorders) and 12.09 (substance addiction disorders).[7] That is, claimant did not have at least two of the following: marked restrictions in activities of daily living, marked restrictions in maintaining social relationships, marked restrictions in maintaining concentration, persistence or pace, or repeated episodes of decompensation, each of extended duration (R. 21).

Specifically, the ALJ found that Ms. Purcell had mild restrictions in activities of daily living based on her testimony that she can perform her own personal care and grooming, household chores including laundry and dishes, driving and shopping, and household bill paying. She had moderate social functioning difficulties as shown by her testimony that she has difficulty getting along with people or trusting them. The ALJ balanced this testimony with the fact that that claimant's most recent treatment notes showed no anger or aggression and also that she reported enjoyment from being with people and that she visited with friends (R. 21). Similarly, evidence of moderate difficulties in concentration, persistence or pace reflected both Ms. Purcell's testimony that she had trouble with memory or focus but also acknowledged treatment notes showing good recall and the ability to complete various memory tests; the ALJ additionally noted that the ability to maintain her household showed good task completion (*Id.*, R. 22).

With respect to periods of decompensation, the ALJ found that the claimant experienced one episode, lasting almost 10 months starting at her onset date in March 2009 (R. 22). The ALJ noted that since the incident, Ms. Purcell "has been stable, with her symptoms controlled with treatment" and no hospitalizations (*Id.*).

---

[7] https://secure.ssa.gov/poms.nsf/lnx/0424505025 (last visited on August 15, 2014) describes the steps used to evaluate the severity of mental impairments to determine whether they meet one of the listings.

The ALJ then determined that Ms. Purcell had the RFC to perform light work except she could lift, carry, push, and pull only ten pounds frequently and twenty pounds occasionally (R. 22). She would also be limited to tasks that can be learned in thirty days or less, involving simple work-related decisions and few workplace changes, and only occasional interaction with the public, coworkers, and supervisors (R. 22-23). She was able to be around others while working, but could only occasionally interact and converse with them (R. 23). She also could not perform work that required an individual to complete a task or fulfill a quota within a certain time period (R. 23).

In support of her RFC determination, the ALJ agreed that Ms. Purcell's impairments could reasonably be expected to cause her symptoms, but she found that Ms. Purcell's statements concerning the "intensity, persistence and limiting effects of these symptoms are not credible" to the extent they were inconsistent with the assessment the ALJ undertook to determine the RFC. That is, she found that the record did not support a finding that Ms. Purcell was unable to work as described in the RFC for a period of twelve months or more due to her mental functioning (R. 24). The ALJ concluded that Ms. Purcell's period of decompensation and inability to work lasted only ten months, from her alleged onset date of March 15, 2009 to early January 2010, at which point she had begun ECT treatments and began showing "vast improvement in functioning and symptoms" (*Id.*).

The ALJ referred to a number of pieces of record evidence in support of her RFC determination. She specifically noted Ms. Purcell's 10 point improvement in her global assessment of functioning (GAF) score within weeks of ECT (R. 25).[8] The ALJ also cited Ms.

---

[8]    GAF is a system used to score the severity of psychiatric illness. http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3036670/ (last visited on August 4, 2014). A score of 50 is at the high end of having serious symptoms or serious impairment in social or occupational functioning while a score of 60 is at the high end of having moderate symptoms or impairments and 61 is at the low end of having some mild

Purcell's own reports in February 2010 that she was "not experiencing any paranoia hallucinations or suicidal ideation" and "fel[t] better and . . . plann[ed] to travel" during the summer (*Id.*). The ALJ also noted that by April 2010, Ms. Purcell was "entertaining guests at her home . . . [and] demonstrate[ed] an improved mood" (*Id.*, R. 607). The ALJ also observed that claimant's physician noted that she had a "great mood and stable affect" at the end of her ECT treatments in July 2010 (R. 25). Furthermore, the ALJ observed that counseling and medication management treatment notes from Dr. Ahmed and Ms. Sinkler reflected stability in Ms. Purcell's condition (*Id.*). The ALJ also pointed out Ms. Purcell had only sought limited treatment for her condition since moving to Wisconsin, indicating that her condition was continuing to improve and that she was still stable (*Id.*). Specifically, the ALJ noted Ms. Purcell saw Dr. Ahmed "only a handful of times" and Ms. Sinkler "five or six times since August of 2010" (*Id.*).[9]

The ALJ also addressed Ms. Purcell's complaints of memory, focus, and confusion problems as they related to her ability to work (R. 25). The ALJ found that Ms. Purcell was still able to sustain work at the RFC level despite these complaints, as treatment notes reflected improved focus, no difficulty understanding others as long as she heard them, intact cognitive functioning, and intact short-term memory (*Id.*). Given Ms. Purcell's ability at the hearing to

---

symptoms or impairments. https://depts.washington.edu/washinst/Resources/CGAS/GAF%20Index.htm (last visited on August 4, 2014). At the time of her December 2009 hospitalization, Ms. Purcell's GAF score was 50; by January 6, 2010 her score had risen to 60 and stayed consistently at 60-61 until at least August 4, 2010, the last time the record reflects assessment of GAF (R. 685, 671, 588). We do note that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed.2013). *See Williams v. Colvin*, No. 13-3607, --F.3d--, 2014 WL 2964078 (7th Cir. July 2, 2014) (recognizing the discontinuation of use of the GAF scale after 2012).

[9] In fact, over the 18 month period between August 31, 2010 and February 2012, Ms. Purcell only saw Dr. Ahmed three times (one 25 minute initial appointment and two seven minute medication appointments) and Ms. Sinkler four times (three of which were in a single three week period), each time for a 40-50 minute therapy session.

accurately recount her work history for the past fifteen years, the ALJ found her long-term memory also was not impaired to the extent Ms. Purcell alleged (R. 25-26).

In reviewing the medical evidence of Ms. Purcell's impairments before determining her RFC, the ALJ assigned "the most weight" to state agency psychological consultant A. Johnson's opinion (R. 27). Dr. Johnson limited Ms. Purcell to a range of unskilled to semi-skilled work "involving brief and superficial interactions with supervisors" (*Id.*). Given Ms. Purcell's ongoing sadness and anger, the ALJ provided for further limitations to the RFC including limiting her to unskilled work with limited contact with others (*Id.*). The ALJ agreed with "Dr. Johnson's assessment that the level of severity asserted by [Ms. Purcell was] unsupported by her treatment notes and activities of daily living" (R. 27-28). The ALJ noted Ms. Purcell was also seen by state agency psychological consultative examiner Dr. Morrin (R. 28). While Dr. Morrin did not provide an assessment of Ms. Purcell's functional limitations, the ALJ considered Dr. Morrin's findings concerning Ms. Purcell's mental health condition when determining the RFC (*Id.*).

The ALJ acknowledged the RFC statements that Dr. Ahmed submitted on Ms. Purcell's behalf, but gave his opinions "little weight" (R. 28). In deciding how to weigh Dr. Ahmed's opinions, the ALJ stressed that Dr. Ahmed only saw Ms. Purcell "on a handful of occasions for less than 30 minutes . . . which erodes the treating relationship" (*Id.*). The ALJ also observed inconsistencies between Dr. Ahmed's two RFC assessments and the most contemporaneous treatment notes.[10] Specifically, Dr. Ahmed had noted one depressive symptom and no manic symptoms in February 2011 (R. 1335), and his treatment notes described Ms. Purcell as "calm," "pleasant" and "stable" but still showing a lot of anger and hostility (R. 1338). And in his January 2012 RFC, Dr. Ahmed noted two depressive symptoms and six manic symptoms (R.

---

[10] When Dr. Ahmed completed the first RFC assessment in February 2011, he had not seen Ms. Purcell for more than three months. When he completed the second assessment in January 2012, he had seen Ms. Purcell only one additional time, over four months earlier, in September 2011.

1357), despite treatment notes for September 2011 – the only visit between February 2011 and January 2012 -- that said Ms. Purcell showed no anger, violence or aggression and seemed to be "calmer, more resilient" (R. 1351). The ALJ concluded that Dr. Ahmed's assessment of Ms. Purcell's functional capacity was unsupported by his own treatment notes and by Ms. Purcell's daily activities (R. 28).

Based on her determination that Ms. Purcell's symptoms were legitimate, albeit not to the extent and intensity she claimed, the ALJ limited the RFC to include unskilled work that required only simple work-related decision making, involving few workplace changes (R. 25-26). The ALJ cited to Ms. Purcell's daily activities, exercise regimen, and volunteer work to support the RFC that Ms. Purcell could perform simple repetitive tasks, follow instructions, and remember tasks (Id.). Additionally, Ms. Purcell's ability to count backwards in multiples of seven showed she was able to focus and concentrate adequately and treatment notes indicated Ms. Purcell had good insight and judgment and linear and goal-directed thought processes (Id.). The ALJ also limited the RFC to positions that did not involve production-rate pace to limit stress and had occasional interactions with others; Ms. Purcell's good relationship with her family and her ability to interact with others while volunteering, hosting parties, going to the gym, and shopping supported an RFC that included occasional contact with the public (R. 26-27). The ALJ further stated that the limitation to avoid hazardous conditions was precautionary given Ms. Purcell's testimony that her medications can cause grogginess (R. 27).

At Step 4 the ALJ determined Ms. Purcell was unable to perform any past relevant work (R. 29). At Step 5, the ALJ concluded Ms. Purcell was able to perform other work based on the VE's testimony and the RFC (R. 29). The ALJ described the information clerk and folding machine operator positions from the VE's testimony, additionally stating the number of positions

for information clerk had been reduced by 50 percent to account for the public contact limitation in the RFC (R. 30). The ALJ therefore concluded that Ms. Purcell was not disabled (*Id.*).

### III.

We review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal citations omitted). We do not reweigh evidence or substitute our own judgment for that of the ALJ. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Ms. Purcell argues for reversal and remand, asserting that the ALJ erred by failing to: (1) attribute controlling weight to Ms. Purcell's treating psychiatrist, Dr. Ashraf Ahmed; (2) support the RFC assessment with substantial evidence; (3) properly assess Ms. Purcell's credibility; and (4) list jobs Ms. Purcell could perform given the RFC assessment. For the reasons stated below, we disagree with Ms. Purcell and grant the Commissioner's motion to affirm the decision of the ALJ.

### A.

Ms. Purcell argues that the ALJ failed to attribute controlling weight to the opinions of her treating psychiatrist, Dr. Ashraf Ahmed. While the ALJ commented that the paucity of contact between Dr. Ahmed and Ms. Purcell "erodes the treating relationship" (R. 28), we do not read the ALJ's opinion as denying that Dr. Ahmed qualifies as a treating physician. And, the

Commissioner does not argue that Dr. Ahmed was not a treater. Therefore, we will analyze the ALJ's decision to give Dr. Ahmed's opinions little weight using the standards for evaluating a treating doctor.

The regulations require an ALJ to give a treating physician's opinions controlling weight as long as they are supported by medical findings and consistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). "But the ALJ need not blindly accept a treating physician's opinion—she may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record." *Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. December 12, 2012), citing *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007). "Though the ALJ must provide some explanation for her decision to discount a treating physician's opinion, our review is deferential: the ALJ's decision must stand as long as she has "minimally articulated" her reasons for rejecting the treating doctor's opinion." *Henke,* 498 Fed.Appx. at 639 (internal citations omitted).

We will not disturb the ALJ's decision to assign little weight to Dr. Ahmed's opinion as we find that she more than minimally articulated a reasonable basis for doing so. The ALJ acknowledged that Dr. Ahmed is a psychiatrist and had actually examined Ms. Purcell (R. 28). However, she also noted that Dr. Ahmed had only seen the claimant on a handful of occasions over a period of a year and a half and did not see Ms. Purcell at all for three and four months prior to Dr. Ahmed's completion of the two RFC assessments.[11] The ALJ pointed to numerous

---

[11] As a point of reference to the question of what is a typical frequency of treatment for Ms. Purcell's mental health condition, we note that in 2008, prior to her period of decompensation, Ms. Purcell saw two psychiatrists and one psychologist a total of six times over a five month period. And in 2009, when Ms. Purcell was in the midst of her mental-health decompensation, she saw her psychiatrist Dr. Price and psychologist Dr. Sidor more than a dozen times each within a nine-month period. Given the frequency with which Ms. Purcell sought mental health treatment in the past, we cannot say Ms. Purcell's treatment relationship with Dr. Ahmed rises to the frequency typical for her condition. Additionally, nothing in the record suggests that Ms. Purcell intended to continue to seeing Dr. Ahmed and indeed, she did not see him again after September 2011, four months before he completed a second RFC assessment.

pieces of evidence supporting her determination that Ms. Purcell was able to perform a job consistent with her RFC, and these findings support her parallel determination to discount Dr. Ahmed's opinions to the contrary.

In addition, the ALJ had a basis to conclude that inconsistencies in Dr. Ahmed's own treatment notes as compared to the RFCs cast doubt on Dr. Ahmed's RFC opinions. For example, Dr. Ahmed's November 1, 2010 treatment notes show that Ms. Purcell saw him for medication management, and that while she demonstrated some hostility, she was able to control it and generally presented as "calm, pleasant, [and] interactive" (R. 1338). Yet, with no intervening contact, on February 3, 2011, Dr. Ahmed stated in his RFC assessment that Ms. Purcell had one depressive symptom – anhedonia – which was not noted in his November 1, 2010 treatment notes (R. 1335).

Likewise, on September 14, 2011, (the next time he saw Ms. Purcell, again in a brief meeting for medication management), Dr. Ahmed reported that he saw no anger, violence or aggression and that Ms. Purcell was eating and sleeping well (R. 1351). Yet, in his January 26, 2012 RFC assessment, again without an intervening visit, Dr. Ahmed described Ms. Purcell as argumentative, hostile and tired, and said that she exhibited two depressive symptoms (anhedonia and psychomotor agitation), and six manic symptoms (R. 1357) – again, none of which were cited in Dr. Ahmed's notes of the September 14, 2011 visit. Indeed, Dr. Ahmed offered no explanation for his conclusion in the 2012 RFC assessment that Ms. Purcell was in worse condition than when he prepared his 2011 RFC assessment, and his treatment notes offer no basis to conclude that she was.

We therefore find no error in the ALJ's decision to give Dr. Ahmed's RFC assessments little weight.

**B.**

Ms. Purcell next argues that the ALJ failed to support her RFC assessment with substantial evidence. We find no basis to disturb the ALJ's ruling.

As an initial matter, we must address an issue that arises repeatedly in the briefs as well as in the ALJ's opinion: the length of Ms. Purcell's mental health decompensation. It is uncontested that Ms. Purcell experienced a period of decompensation from mid-March 2009 through December 2009, a period of almost ten months. Ms. Purcell, however, contends that her decompensation continued after December 2009.

An "episode of decompensation" is defined as an "exacerbation[] or temporary increase[] in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010) (quoting 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00). Decompensation "may be inferred from medical records . . . or relevant information in the record about the existence, severity, and duration of the episode." 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00.

The length of the decompensation is relevant to several steps in the analysis of whether Ms. Purcell is disabled. As the ALJ points out, to be disabled under the SSA, a claimant must be unable to work because of an impairment or combination of impairments that lasts or is expected to last for at least 12 months. Further, at Step 3 of the five-step analysis, the frequency and lengths of periods of decompensation affect whether a particular mental impairment meets the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[12] These

---

[12] Although the listing defines repeated episodes of decompensation as "three episodes within one year, or an average of one every four months, each lasting for at least two weeks," it also states that for claimants who experience "less frequent episodes of longer duration," the ALJ should "determine if the duration and the functional

are two different analyses related to decompensation, and it is not entirely clear which one Ms. Purcell relies on in arguing that she should be found disabled. The absence of much discussion related to the listing criteria leads us to suspect it's the former, although Ms. Purcell points to no law equating a period of decompensation of 12 months – even if we were to find one – with an automatic finding of disability. We have similarly been unable to find any supporting law, but will nonetheless address the question of decompensation from this perspective.

Ms. Purcell skirts over the question of whether her alleged period of decompensation is ongoing or if instead it ended sometime after the 12 month threshold but before the hearing. That is, she does not ask us to grant her partial benefits for some finite period of disability that lasted for fourteen or sixteen or twenty months. Instead, she argues that the record evidence supports a finding that she continued to have symptoms of bi-polar depression after beginning ECT treatments and thus the period of decompensation was longer than 10 months. But while Ms. Purcell may argue that the evidence of her recovery could be assessed differently than the ALJ did, our role is to determine whether the ALJ's opinion is supported by the evidence and if she built a logical bridge from that evidence to her conclusion.

We find no sound basis to disturb the ALJ's assessment of the record evidence and her finding that the decompensation ended after 10 months. Even if ECT itself may be an aggressive treatment as Ms. Purcell alleges, the listing requires a period of decompensation to be demonstrated by an "exacerbation in symptoms or signs that would ordinarily require increased treatment." 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04. While the period from March 2009 through December 2009 meets this definition, it was reasonable for the ALJ to determine that the time period beginning in January 2010 and continuing until the hearing did not. Ms. Purcell's

effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04; *see also Larson*, 615 F.3d at 750.

symptoms decreased significantly immediately after beginning ECT treatments, and she did not experience another spike. Further, evidence of her recovery only increased as time went on to the point that by the time she moved to Wisconsin, the claimant did not pursue additional ECT treatments and saw her new mental health providers on a minimal basis.

Despite claimant's argument to the contrary, we do not find that the ALJ improperly "cherry-picked" those parts of the medical record that supported her finding that the period of decompensation ended by January 2010. It is true that an ALJ may not sift through the evidence and reference only those treatment notes that support her finding, while ignoring those which lead to a contrary conclusion. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2012). However, an ALJ does not need to discuss all the evidence in the record, as long as she minimally articulates her reasons and supports her assessment with substantial evidence. *See, e.g., O'Connor–Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). The ALJ here satisfied that standard.

A review of all of Ms. Purcell's treatment notes, particularly those from January 2010 forward, demonstrate a marked improvement in her mental state, in her response to her medication and ECT treatment, and in her initiation of activities such as travel, exercise and the use of social media (R. 619, 868, 873-74, 984-90).[13] And to the extent Ms. Purcell also relies on Dr. Ahmed's opinions to show that her decompensation extended past January 2010, we note our earlier comments upholding the ALJ's decision to discount Dr. Ahmed's conclusions.[14]

---

[13] In fact, many of the documents that claimant herself cites as evidence of continued decompensation actually support an alternative conclusion. For example, documents that claimant purports show her continued depressed state actually reflect a eurythmic mood (R. 1367), that she reported "feeling better" (R. 619) and that she reported feeling "okay right now" (R. 622).

[14] Ms. Purcell argues that the ALJ erred by relying on only "3 examinations by Dr. Ahmed, all of which demonstrated less severe symptoms than other visits" (doc. # 14: Memorandum Support of Motion for Summary Judgment at 13). But as we note above, those three visits were in fact the sum total of Ms. Purcell's interaction with Dr. Ahmed.

We find that the ALJ has sufficiently supported her determination that the period of decompensation only lasted ten months from March 2009 through December 2009. Therefore, the claimant did not suffer from an impairment rendering her unable to work for a period of at least 12 months. And as the regulations leave the determination of whether a single longer period of decompensation is equivalent to repeated periods of decompensation up to the ALJ, we will also not disturb her decision to find that the claimant's decompensation did not medically equal the listing criteria.

With respect to whether the RFC is supported by substantial evidence, the ALJ carefully analyzed the medical and nonmedical evidence, and assessed Ms. Purcell's abilities in accordance with 20 C.F.R. § 404.1545 and SSR 96-8p. SSR 96-8p specifies that an ALJ must include in his RFC assessment "*all* of the relevant evidence in the case record, such as: [m]edical history; [m]edical signs and laboratory findings; [t]he effects of treatment . . . reports of daily activities . . . recorded observations; medical source statements; effects of symptoms . . . and evidence from attempts to work." SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) (emphasis in original). Additionally, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each [of his] conclusion[s], citing specific . . . facts" from the evidentiary record. SSR 96-8p, 1996 WL 374184, at *7; *Conrad v. Barnhart*, 434 F.3d 987, 991 (7th Cir. 2006).

In her RFC assessment, the ALJ thoroughly detailed the evidence SSR 96-8p required. She reviewed the medical evidence, Ms. Purcell's daily activities and her hearing testimony. We disagree with Ms. Purcell's assertion that the ALJ failed to consider medical records that showed she continued to be depressed with abnormal affect and had poor concentration, confusion, memory loss and anterograde amnesia as a result of the ECT treatment. To the contrary, the ALJ

noted Ms. Purcell's depression, finding it to be severe (R. 20). The ALJ acknowledged that Ms. Purcell was "processing the loss of her son and [was] continuing to experience sadness over her loss," but also wrote that Ms. Purcell showed significant improvements in her symptoms" and that Ms. Purcell testified that her symptoms were well controlled with her current medications (R. 25). The ALJ specifically observed that the "evidence of record support[ed] that despite [Ms. Purcell's] ongoing grief, she ha[d] maintained stability with regard to her mental impairments" (*Id.*).[15]

The ALJ addressed Ms. Purcell's memory, focus and confusion problems by opining that "the record as a whole supports that despite these symptoms, [Ms. Purcell] is able to sustain work at the level described in the residual functional capacity" (R. 25). The ALJ cited to treatment notes in which Ms. Purcell had reported improvements in her focus and had no difficulty understanding others. Additionally, the treatment notes showed she "ha[d] a linear and goal directed thought process, indicating intact cognitive functioning" (*Id.*). She was able to "recall three objects after a five-minute delay and was able to accurately assess her work activity over the past 15 years" (*Id.*). Ms. Purcell was able to understand simple instructions, evidenced by her ability to follow her gym instructor's directions during class (R. 26). The ALJ also noted claimant's ability to perform simple, repetitive tasks such as household chores, laundry, and preparing meals (*Id.*). Additionally, she was able to follow instructions during her volunteer work, and at the hearing, the claimant was able to provide a detailed medical history despite an alleged difficulty with her long-term memory (*Id.*).

---

[15] We also find that, contrary to Ms. Purcell's argument, the ALJ did not improperly engage in "an all-too-common misunderstanding of mental illness" by relying on single or sporadic reports of a "good day" to conclude that claimant's bi-polar depression was stable enough to allow her to work. *Smith v. Astrue*, 11 C 370, 2013 WL 320407 (N.D. Ind. January 28, 2013), quoting *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). Indeed, not only did the ALJ consider the full scope of medical evidence to find ongoing and increasing improvement, but she also recognized Ms. Purcell's continuing sadness and anger, as well as her remaining symptoms as justifying additional limitations in her RFC determination.

Even though the ALJ found that the record evidence did not fully support Ms. Purcell's claims about the severity of her symptoms, the ALJ accommodated her alleged problems with memory, confusion and focus by limiting Ms. Purcell to unskilled work (R. 26). The ALJ also limited Ms. Purcell to a "position that require[d] only simple work-related decision making" to limit stress that might exacerbate her depression (*Id.*). Additionally, the ALJ limited Ms. Purcell to a "position with few workplace changes . . . that does not involve a production-rate pace" so that Ms. Purcell would not have to remember how to perform new tasks and could work at her own pace (*Id.*). We find the ALJ's determination of Ms. Purcell's RFC is supported by substantial evidence.

## C.

Next, Ms. Purcell argues that the ALJ erred in assessing her credibility with respect to the intensity and persistence of her symptoms using the criteria set forth in 20 C.F.R. § 416.929(a). "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness ... this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue,* 688 F.3d 306, 310–11 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Skarbek v. Barnhart,* 390 F.3d 500, 504–05 (7th Cir.2004)).

To assess credibility, the ALJ must consider the claimant's statements about symptoms and how they affect her daily life and ability to work. *Shideler,* 688 F.3d at 310–11. Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* When determining disability, the ALJ must weigh the subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any

medication; (5) treatment, other than medication, for relief of pain or other symptoms; (6) other measures taken to relieve pain or other symptoms; and (7) other factors concerning functional limitations due to pain or other symptoms. *See* 20 C.F.R. § 416.929(c)(3)

Ms. Purcell contends that it was wrong for the ALJ to find her not fully credible on the ground that she was able to perform various activities of daily living. Ms. Purcell argues that her ability to perform activities such as taking care of her home and engaging in social media do not equate to the ability to sustain full time work and thus, her credibility should not be in doubt.

Ms. Purcell oversimplifies the ALJ's credibility analysis. The ALJ provided ample support for partially discounting Ms. Purcell's credibility and accounting for the 20 C.F.R. § 404.1529(c) factors, and her analysis went beyond a simple recitation of the household activities Ms. Purcell could perform. She reviewed all of Ms. Purcell's daily activities, including doing significant household chores, exercising, preparing meals, doing laundry, entertaining guests at her home, using computer-based social media and driving (R. 23-27). Additionally, the ALJ noted Ms. Purcell was able to volunteer in the summer and fall (R. 26). The ALJ observed that despite alleging that she was still too impaired to work, Ms. Purcell had not seen a doctor regularly since her move to Wisconsin, and that the medical evidence showed her symptoms were well controlled by medication (*Id.*).

Given that the ALJ fully explained and supported her conclusion that Ms. Purcell's alleged symptoms were not as severe as she alleged, we find substantial evidence supports the ALJ's decision to find that Ms. Purcell was not fully credible.[16]

---

[16] We note that the ALJ did not discount Ms. Purcell's testimony in its entirety; she specifically adjusted the claimant's RFC to provide for unskilled instead of semi-skilled work to account for her ongoing memory complaints (R. 28).

**D.**

Lastly, Ms. Purcell argues that the ALJ erred by relying on the testimony of the VE that a hypothetical claimant with her limitations could work as an information clerk or a folding machine operator. Ms. Purcell contends that the VE's testimony about available jobs conflicted with the Dictionary of Occupational Titles (DOT) because the information clerk position required contact with the public that was outside the scope of the ALJ's RFC assessment, and that the folding machine operator position required exposure to "hazardous machinery." Ms. Purcell also contends that because the information clerk position requires a General Education Development (GED) reasoning level of "4" it exceeds the ALJ's hypothetical for that reason as well.

When a VE's testimony about available jobs "appears to conflict with the dictionary," SSR 00-4p requires an ALJ to obtain "a reasonable explanation for the conflict." *Givens v. Colvin,* No. 13-2000, 551 Fed.Appx 855, 863 (7th Cir. Dec. 17, 2013) (quoting *Overman v. Astrue,* 546 F.3d 456, 463 (7th Cir. 2008)). But if a claimant does not object to the VE's testimony at the hearing, the conflict between that testimony and the dictionary must be so obvious "that the ALJ should have picked up on [it] without any assistance." *Terry v. Astrue,* 580 F.3d 471, 478 (7th Cir. 2009) (quoting *Overman,* 546 F.3d at 463).

The VE testified at the hearing that the travel information clerk position (DOT # 237.367-018, light, SVP 2) would be available to Ms. Purcell given her age, education, work experience and RFC (R. 122-23). He stated there were approximately 2,500 positions in the Wisconsin area and 78,000 positions nationally (*Id.*). However, the VE reported that it was necessary to discount the number of positions by fifty percent in order to remove positions that were more receptionist-oriented and had public contact (R. 123). The numbers given by the ALJ in her

opinion for the position reflect the discount, with 1,250 positions in the Wisconsin area and 39,000 positions nationally (R. 30). Given that the claimant's attorney did not object to the VE's testimony that the information clerk job would be available to someone with Ms. Purcell's RFC, the question becomes whether there was an obvious conflict between the VE's testimony and the DOT such that the ALJ should have picked up on it.

We find that there was no conflict between the part of Ms. Purcell's RFC that limited her contact with the public and the travel information clerk duties. While it is true that some of the jobs that fall under this category are in the nature of a receptionist position, the VE accounted for Ms. Purcell's limitation by eliminating those jobs completely. What was left are information clerk jobs that do not require much or any contact with the public. Given that the VE himself noted Ms. Purcell's RFC and reduced the number of jobs she could hold, we don't find any conflict -- obvious or otherwise -- between the remaining information clerk job and Ms. Purcell's need to have only limited contact with the public.

A more complicated question is whether the information clerk job's GED reasoning level of 4 places it obviously outside Ms. Purcell's RFC – which limits her to jobs that could be learned in 30 days or less and which require only simple, work-related decisions – so that the ALJ should have known not to consider it. While district court case law is replete with debate about whether and how to correlate a particular GED level with specific job duties, the Seventh Circuit has recently spoken on the issue, making it clear that "the dictionary's General Educational Development levels focus on the worker's educational background, not on-the-job requirements." *Givens*, 551 F.Appx. at 863.

In *Givens*, the claimant argued that he could not hold a job that had a GED language level of 3 because he was in special education classes in high school and did not achieve his diploma

until he was almost 40 years old. The appeals court found that even though GED language level 3 includes the abilities to be able to read novels, atlases and encyclopedias, write reports and essays and speak to audiences, the two job descriptions actually at issue for the claimant did not list or require those skills. Further, the court held that it was "not obvious from the record that Givens would not meet those language development criteria." *Givens,* 551 Fed.Appx. at 863.

Similarly, most of the abilities listed under a GED reasoning level 4[17] are not relevant to the actual job duties of a travel information clerk. According to the DOT, a travel information clerk, 237-367-018:

> Provides travel information for bus or train patrons: Answers inquiries regarding departures, arrivals, stops, and destinations of scheduled buses or trains. Describes routes, services, and accommodations available. Furnishes patrons with timetables and travel literature. Computes and quotes rates for interline trips, group tours, and special discounts for children and military personnel, using rate tables. www.occupationalinfo.org/23/237367018 (last visited on August 18, 2014).

Given the evidence in the record regarding Ms. Purcell's ability to think logically and critically, recall facts and complete tasks, we find no error in the ALJ's conclusion that she could perform this job.

In any event, we find that any arguable conflict between the VE's testimony and the DOT listing was not so obvious that the ALJ should have recognized and addressed it in her opinion. The "specific vocational preparation" level of the information clerk job is a 2, which correlates to unskilled work – consistent with Ms. Purcell's RFC. *Id.* Ms. Purcell and her attorney did not question the skills needed for the information clerk position during the hearing, and thus we find that the ALJ was entitled to rely on imperfect VE testimony. *Overman,* 546 F.3d at 455-56.

---

[17] GED reasoning level 4 expects an individual to: "Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. (Examples of rational systems include: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.) http://www.occupationalinfo.org/appendxc_1.html#III (last visited on August 6, 2014).

With regard to the folding machine operator position (DOT # 208.685-014, light, SVP 2), nothing in the DOT description suggests an obvious conflict with the Ms. Purcell's need to avoid jobs involving a hazardous machine or condition. According to the DOT description, the position involves turning knobs, starting the machine, feeding paper sheets into the machine, and removing folded sheets and placing them into envelopes. http://www.occupationalinfo.org/20/208685014.html (last visited on August 6, 2014). Given that Ms. Purcell reported she was able to operate a motor vehicle, which involves turning a steering wheel, starting the vehicle, adjusting mirrors and seats, and the like, we do not find that the VE's testimony that she could perform this job is in conflict with the DOT. The folding machine operator position holds a GED reasoning level of 2, and thus remains an available position for the plaintiff.

We therefore find that the ALJ did not err in listing the information clerk and folding machine operator positions as work available to Ms. Purcell.

## CONCLUSION

For the reasons stated above, we deny Ms. Purcell's motion to reverse and remand the ALJ's decision (doc. #13) and we grant the Commissioner's motion to affirm the denial of benefits (doc. # 37). This case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED:  September 3, 2014**